**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NOS. A-2855-17T2
      A-4616-17T2

AMERICAN FABRIC
PROCESSORS, LLC, d/b/a
AMERICAN FABRIC
PROCESSORS; AMERICAN
FABRIC PROCESSORS, LLC,
d/b/a AMERICAN FABRIC
PROCESSORS as assignee of
CORAL DYEING & FINISHING
CORPORATION, d/b/a CORAL DYEING
& FINISHING CORPORATION
and THE JDM GROUP LLC,
d/b/a JDM LLC,

   Plaintiffs-Appellants,

v.

VERLAN FIRE INSURANCE
COMPANY and SILK CITY
STONE, LLC,

   Defendants-Respondents.

_____

GREEN POND LLC (formerly Carson
& Gebel Ribbon Company LLC),

   Plaintiff,

v.

JDM GROUP, LLC, AMERICAN
FABRIC PROCESSORS, LLC, and
JACOB BINSON,

     Defendants.

———————————————

FRED DOMBROW and CORAL
DYEING AND FINISHING
CORPORATION,

     Plaintiffs-Respondents,

v.

JACOB BINSON, AMERICAN
FABRIC PROCESSORS and
JDM GROUP,

     Defendants-Appellants.

———————————————

Argued (A-2855-17) and Submitted (A-4616-17)
October 16, 2019 – Decided August 3, 2020

Before Judges Fisher, Accurso and Gilson.

On appeal from the Superior Court of New Jersey,
Law Division, Passaic County, Docket Nos. L-2384-
15 and L-0495-16; and L-2357-16.

Richard A. Murray argued the cause for appellants in
A-2855-17.

Matthew J. Lodge argued the cause for respondent
Verlan Fire Insurance Company in A-2855-17

(Kennedys CMK LLP, attorneys; Matthew J. Lodge and Joshua Scott Wirtshafter, of counsel and on the brief).

Michael C. Salvo argued the cause for respondent Silk City Stone, LLC in A-2855-17 (Ahmuty Demers & Mc Manus, attorneys; Michael C. Salvo, on the brief).

Ferro and Ferro, attorneys for appellants in A-4616-17 (Nancy C. Ferro, on the briefs).

Welt & Kuzemczak, LLC, attorneys for respondents in A-4616-17 (David M. Welt, of counsel and on the brief).

PER CURIAM

Throughout the record in these appeals, the matters are referred to as complex. They are not, however, as complex as they are convoluted, a circumstance arising from the fact that these two non-jury cases, as well as a related third not before us, were not consolidated or decided by a single judge but decided by different judges at different times.[1] Of the two before us, one was tried and the other disposed of summarily. After our close examination of the record in light of the parties' arguments, we affirm the former (Dombrow v. Binson) and reverse the summary judgment in the latter (American Fabric v. Silk City).

---

[1] We decide both these appeals by way of a single opinion.

A-2855-17T2

## I.

To understand the bases and dispositions of these cases, some consideration must be given to Coral Dyeing & Finishing Corp.'s history. The company was started in 1955 and operated in Paterson for many years by the grandfather and father of Fred Dombrow, Jr., who started with the business in 1981 as a mechanic. By the business's peak in the late 1990's, it had 120 employees, but apparently the North Atlantic Free Trade Agreement, which seriously affected the textile industry in this country, caused the business's decline, starting in 2002. In 2009, Dombrow was required to decide whether he should borrow money to "retool to keep the place going" or "shut it down." Out of dedication to the business and its employees, he chose the former course and obtained a $1,250,000 loan from Metro Funding Corporation Partners, LLC. Dombrow executed a promissory note for the repayment and used Coral Dyeing's real estate as collateral. These funds were used to diversify the company's product lines, but those efforts proved ineffectual; the loan went into default, and Metro commenced a foreclosure action. With no other recourse, in 2013, Coral Dyeing filed a voluntary petition for bankruptcy under Chapter 11, and thereby stayed Metro's foreclosure action.

4

After the start of the bankruptcy proceedings, four parcels of Coral Dyeing's real estate were sold to 555 E. 31 Paterson, LLC, for $2,100,000; the bankruptcy court approved the agreement. That buyer eventually chose not to go forward, but the sale was revived when that buyer, for $100,000, assigned its contract rights to JDM Group, an entity controlled by Jacob Binson. The amount of overdue property taxes to be paid were fixed by the bankruptcy court, but the closing was delayed and, with the continuing non-payment of taxes and the addition of interest and penalties, the amount due increased by $222,723.98 to a total of $1,114,592.74. Because, as the trial judge in Dombrow v. Binson recognized, the transaction was designed so that Dombrow was neither required to bring any cash to the closing nor receive any cash as a result of the closing, Binson faced a situation where for his entity, JDM Group, to receive title, a greater amount was due in order to satisfy the city's tax bill. This disconcerting circumstance caused, as the Dombrow v. Binson judge found, that Binson walked out of the May 2014 closing a number of times. Eventually, however, the transaction closed, although the precision normally expected in such a transaction was sorely lacking. For example, the closing statement, as the judge found, was "fraught with error, and is fraught with sloppiness" so as to be "worthless."

A-2855-17T2

A few days after the closing – for no ostensible reason – Dombrow signed two promissory notes: one obligating him to pay JDM Group and Binson $66,500 by October 30, 2014, and the other obligating Dombrow and Coral Dyeing to pay JDM Group and Binson $400,000 no later than April 30, 2016. The total amount due appears to be the approximate amount of the shortfall between what Binson and JDM Group were obligated to pay to obtain the property.

The following month, Coral Dyeing sold its business and remaining assets[2] to Binson's American Fabric for $466,500, the same amount as the promissory notes. The contract expressed the consideration exchanged by stating that the "Seller is indebted to the Buyer in the sum of $466,500" – a reference to the promissory notes[3] – and, because "[t]he Seller is unable to effectuate payment of this loan [the Seller] has elected to transfer all of its assets to the Buyer in exchange for a release of the debt."

---

[2] The contract states that Coral Dyeing conveyed its "inventory, accounts receivable, fixtures, equipment, intellectual property, goodwill, trade name, trademarks, . . . . and all rights under any contract related to the Business."

[3] According to Dombrow, the amount reflected the debt he owed to PNC Bank for a loan used to purchase Coral Dyeing machinery and also the debt on his own home. On the other hand, Binson testified that the amount reflected the property taxes not paid on the real property then transferred.

6

With the completion of these transactions, Dombrow became employed by American Fabric, which had become the operator of the business that had once been Coral Dyeing. The employment relationship started amicably but didn't last long. Dombrow and Binson soon encountered fundamental differences about the business, causing Binson to terminate Dombrow's employment within the month. Binson claimed he paid Dombrow $1000 per week for the four weeks of employment, while Dombrow denied being paid anything. The termination of employment left Dombrow in financial straits; he could not meet his obligations under the PNC Bank loan, see n.3, causing that bank to initiate foreclosure proceedings on his home and the initiation of his own bankruptcy proceedings.

As we observed at the outset, conveyances regarding Coral Dyeing, its property and assets, formed the background for three lawsuits, all commenced in the same vicinage but inexplicably never consolidated (except for two of them being consolidated for discovery purposes only): Dombrow v. Binson (which is before us in A-4616-17), Green Pond LLC v. American Fabric (not before us), and American Fabric v. Silk City (which is before us in A-2855-17).

Dombrow v. Binson – of which we will have more to say later in Section II of this opinion – alleged breach of contract, unjust enrichment, fraud and conversion arising from the transactions that led to the execution of the promissory notes and the sale of Coral Dyeing's business and remaining assets to American Fabric in June 2014.

Green Pond LLC v. American Fabric arises from another transaction. In January 2014, a few months before Coral Dyeing's and Dombrow's transactions with Binson, American Fabric and JDM Group, Green Pond's predecessor in interest (Carson and Gebel Ribbon Company LLC) purchased – through the bankruptcy court – the equipment and assets, including inventory, of Coral Dyeing. Green Pond brought suit against American Fabric and Binson to replevy the purchased equipment and property still located at Coral Dyeing's premises. While that action was consolidated with American Fabric v. Silk City, for discovery purposes, the claims were decided by a different judge than the judges who handled the cases now before us.

American Fabric v. Silk City is the third action. The orders in question in the appeal of that matter, which we will examine in Section III of this opinion, were entered by yet another judge. In that case, American Fabric claimed property it had purchased from Coral Dyeing through the conveyances

at issue in <u>Dombrow v. Binson</u> was damaged by a subtenant, Silk City, and covered by an insurance policy issued by Verlan Fire. At the heart of that case is the question whether American Fabric was the rightful owner of that property or Green Pond, whose interests were considered in <u>Green Pond v. American Fabric</u>.

The obvious overlapping factual disputes in these three separated cases is most evident and troubling because the decisions in each case were rendered by different judges. The judge in <u>Dombrow v. Binson</u> was required to consider the impact of a partial summary judgment entered by another judge in <u>Green Pond v. American Fabric</u>, and yet another judge, in <u>American Fabric v. Silk City</u>, was required to consider the impact of the findings rendered by the judge in <u>Dombrow v. Binson</u>.

With this brief understanding of the convoluted collection of lawsuits brought concerning these parties and the various conveyances, we turn first to <u>Dombrow v. Binson</u>.

## II.

In <u>Dombrow v. Binson</u> (A-4616-17), the judge conducted a bench trial in September and October 2017, and rendered findings of fact and conclusions of

law through an oral decision placed on the record on October 17, 2017. On

December 12, 2017, the court entered judgment, which:

- dismissed the breach of contract claim, the judge finding plaintiff failed to prove the alleged contract existed;

- found that defendants were unjustly enriched and awarded to plaintiffs $374,375 plus prejudgment interest for a total award of $376,067.28;

- denied plaintiffs' request for counsel fees;

- determined that plaintiffs conveyed to defendants American Fabric, JDM Group and Binson "all personal property and assets of Coral Dyeing," including "all machines, tools, equipment, fabric material and other assets of Coral Dyeing . . . except for the equipment and personalty that was previously awarded to 'Carson and Gabell [now Green Pond]'" in a partial summary judgment entered by another judge in another case;[4] and

- found that "[a]ny personal property owned by Fred Dombrow and not Coral Dyeing . . . is not transferred as part of this ruling " and that the

_____

[4] By this time, the Green Pond judge had granted partial summary judgment and issued a writ of replevin in Green Pond's favor for the turnover or removal of the equipment and machinery from the premises. That was not a final disposition, since whatever else Green Pond purchased that remained on the premises was reserved for a later plenary hearing. Apparently, Green Pond was unable to obtain its property and sought damages for the loss incurred. We made inquiries and learned that the remaining issues in Green Pond v. American Fabric were amicably resolved.

parties "have already resolved these issues or will, through their attorneys."

Defendants Binson, American Fabric, and JDM Group filed post-trial motions seeking consolidation and other relief, all of which were denied, and following which defendants filed their notice of appeal. When the Clerk of this court questioned whether all issues as to all parties had been resolved, the appeal was dismissed and the trial judge entered an order that dismissed whatever claims remained, prompting the appeal in A-4616-17.

Defendants argue in this appeal that:

I. THE COURT ERRED IN AWARDING DAMAGES TO PLAINTIFF ON THE CLAIM FOR UNJUST ENRICHMENT SINCE THE PROMISSORY NOTES WERE VALID AND THE CORAL DYEING EQUIPMENT AND MACHINERY WERE NOT OWNED BY DEFENDANT.

II. THE COURT ERRED IN DENYING PLAINTIFF'S MOTION FOR RECONSIDERATION WHICH WAS BASED ON THE GROUND THAT PLAINTIFF WAS JUDICIALLY ESTOPPED FROM CLAIMING TO BE A CREDITOR AFTER DECLARING HIMSELF TO BE A DEBTOR IN THE BANKRUPTCY ACTION BASED ON THE SAME PROMISSORY NOTES.

III. THE COURT ERRED IN WRITING A BETTER AGREEMENT FOR THE PLAINTIFF THAN THE AGREEMENT INTO WHICH PLAINTIFF WAS ENTERED.

11

We find no merit in these arguments.

To understand the case and our disposition, one must appreciate the trial judge's accurate and appropriate description of the closing of the real estate transaction as "sloppy" and the beyond-sloppy later sale of the remaining assets and business of Coral Dyeing. The judge recognized the realities of the situation and that Binson was unhappy with the course of the real estate transaction; Binson had originally agreed to pay $2,300,000, but with the delays prior to closing and the drastic increase in the amount of taxes owed to the city, the amount he was required to pay had greatly increased. It is here, as the judge found, that the parties got inventive:

> [I]n this case those hidden costs took on a very different role. They weren't the normal hidden costs and things of that sort, and the deal was structured in a way that Mr. Dombrow is bringing no money to the closing, nor is he going to walk away from the closing with any money. He's in bankruptcy court. He could have just abandoned the property, walked away from it.
>
> . . . .
>
> Now, Mr. Binson, I agree – I find it credible, was getting frustrated here, and as he said, there were three or four times . . . he was going to walk away from the deal, walked out of the room. But he was trapped in a way, because he had already given the 100,000 to [the original buyer], so, he had a big investment in it, and he had other monies invested in it, and so . . . he also

12

knew it was a good deal. So, there's a lot going on. A lot of dynamics here.

And as the time was going by, and Mr. Binson is being told you got to come up with more money, and more money, and more money, and I agree with what he said here on the witness stand, he said, what am I, the golden goose? I got to keep reaching into my pocket, and paying, and paying, and paying.

So, I can understand his frustration, but that's what happens in this type of scenario, and either you continue going along as the golden goose, or you bail out, and the longer you go along as the golden goose, and the longer you keep putting money in, if you bail out and walk away, you lose that money, and the big beneficiary becomes MFC[5] because they're the backup bidder. They come in and get it really, really cheap.

Binson, as the judge found, decided to stay with the transaction but remained desirous of getting the property at the original price:

So, due to the delays, and due to other things that were going on, Mr. Binson doesn't get this property for 2.3 million, 2.4 if you add the 100,000 he paid for the assignment, he's up in the 2.7 range. There's a shortage of $400,000, and Mr. Binson believes that I shouldn't have to pay this 400,000. I got a contract at 2.3 million. I shouldn't be paying 2.7 when I got a $2.3 million contract. Mr. Dombrow has got to come up with the 400,000. But Mr. Dombrow is in bankruptcy, and the judge spelled out what he was supposed to be paying, which I reviewed the 6,000,

---

[5] The reader will recall from the earlier discussion that MFC had commenced a foreclosure action that was stayed when the bankruptcy action was started.

the 20, the 25,000. But, other than that, he's not coming to this closing with any money, nor is he walking out with any money.

So, it either was Mr. Binson was going to pay the added on expenses, caused by the delay, or otherwise, or Mr. Binson's remedy was to say I'm not buying this property. But he was, as I said earlier, he might have felt it's still a good deal, and maybe I can't bail out, because I got too much invested, but I think, and I firmly believe that although Mr. Binson believed it was Mr. Dombrow's obligation to come up with this $400,000 shortage, he's wrong in that respect, as a matter of law. Mr. Dombrow could not be required to come up with anything.

And, in fact, if Mr. Binson said to Mr. Dombrow you got to come up with some money, or I'm not buying it, Mr. Dombrow's response would have been, then don't buy it, because whether you buy it or not, I'm not getting a quarter out of this thing. So, don't buy it. He wasn't going to bring any money to the table, and he wasn't going to walk away with a dime in his pocket from this closing.

It would appear that for these reasons the promissory notes were extracted from Dombrow and signed a few days after the closing. Then, when the Coral Dyeing assets were sold to defendants, the extinguishing of the notes represented the consideration Dombrow purportedly received from defendants for those assets.

Dombrow testified that he signed the notes so he could get the business back up and running with defendants as the business owner and he as a key

14

employee, expecting to be employed for at least five years and at a salary that would help him resolve his own personal debts.  The judge recognized, however, that the parties were not on the same page as to their future relationship:

> Mr. Dombrow is not represented by counsel [at the closing].  He's still suffering the almost blind desire to stay with the company and just agreed to a lot of things, probably because he had a carrot being dangled in front of him.  I'll employ you . . . .
>
> This whole employment contract, I don't know what the terms were.  I don't know if there was a contract.  I don't know if there w[ere] discussions.  Nothing is in writing.  [Dombrow] says, "He gave me 30 percent of the business," [Binson] says, "No way."  [Dombrow] says, "I was going to be allowed to work in the lab and develop my new theories," Mr. Binson says, "No way.  I wanted him to make sales."  Mr. Dombrow says, "I was going to be paid a lucrative salary."  Even though he was employed, I don't care if it's two weeks, four weeks, five weeks, six weeks, there was – there's no nexus to him being paid a $2,500 salary.

From all these and other parts of his overall findings, the judge's ultimate decision turned on his determination that there was no consideration for the transfer of the Coral Dyeing business and assets to Binson or American Fabric because the notes obligated Dombrow to pay something he did not owe and, so, the extinguishing of the notes, gave no consideration to Dombrow.  As

15

the judge explained based on his consideration of the evidence and the parties' credibility:

> [A]fter much thought and much consideration to what the contract says about the indebtedness, the fact of the matter is, there was no indebtedness at that time. Despite the fact that Mr. Dombrow agreed, foolishly, that, yes, I owe you 466,000 and I'll sign these two notes, which then you could hold against me so that I don't beat you and not give you the employment I'm promising you, the – it's a myth. It doesn't exist. There was no indebtedness. Mr. Binson unfortunately got hit with having to pay a lot more than he hoped to have to pay, and he was out some 400,000 at some point in this whole transaction. But it wasn't a debt that he was legally entitled to get the money back from Mr. Dombrow. And notwithstanding that, he commits Mr. Dombrow to agree to it.
>
>     . . . .
>
> So he agrees to sell his business for $466,500 and he gets nothing in return for it. What he gets is, in Mr. Binson's mind, well, he wiped out the money he owed me. But he never owed him the money. There was no consideration to support those notes.

In light of these findings, the judge viewed the overall transactions in this way. First, Binson purchased and received the real property. But he ended up paying more than he anticipated, so he sought to recoup that loss through the later transactions with Dombrow. He extracted the promissory notes for which there was no consideration and then extinguished the notes to

16

make it appear as if consideration was given for his obtaining the remaining assets of the business. Based on those findings, the judge concluded that the only equitable way of putting Dombrow in the position he should have found himself in was to apply unjust-enrichment principles.

The judge's extensive findings are grounded in evidence found credible. Because the trial judge was in the position of observing and assessing the witnesses' credibility and evaluating the weight of their testimony, we are obligated to defer to those findings unless convinced they are "manifestly unsupported by or inconsistent with" the evidence "so as to offend the interests of justice." Rova Farms Resort, Inc. v. Investors Ins. Co., 65 N.J. 474, 484 (1974). In cases where the facts are starkly disputed, we are particularly loath to second-guess a trial judge's findings. After close examination of the record, we conclude that the findings are fully supported by the evidence and testimony the judge was entitled to find credible and, therefore, we will defer to those findings.

The judge's application of unjust-enrichment principles was also appropriate here. These principles apply in cases where a plaintiff shows that a defendant "received a benefit" and "retention of that benefit without payment would be unjust." VRG Corp. v. GKN Realty Corp., 135 N.J. 539, 554 (1994);

17

see also Thieme v. Aucoin-Thieme, 227 N.J. 269, 288 (2016). Having reached this fundamental conclusion, the judge then painstakingly ascertained the extent to which defendants had been unjustly enriched in entering the judgment now under review.

Because the judge's factual findings are entitled to our deference and because the application of unjust-enrichment principles was appropriate in these circumstances, we reject defendants' arguments in A-4616-17. To the extent we have not specifically addressed any other aspects of defendants' arguments, we find them without sufficient merit to warrant further discussion in a written opinion. R. 2:11-3(e)(1)(E).

III.

In the second appeal before us (A-2855-17), the record reveals that plaintiffs American Fabric and JDM Group filed their complaint against Silk City and Verlan Fire Insurance Company in July 2015, alleging that in June 2014 American Fabric purchased certain property and assets of Coral Dyeing and became, as it alleged, the "assignee of" Coral Dyeing, while JDM Group claimed that in May 2014 it obtained a quitclaim deed from Coral Dyeing and became the owner and landlord of the real property in Paterson. At those

premises, Coral Dyeing had both operated a dye house and a storage area, which housed hundreds of rolls of fabric.

Plaintiffs American Fabric and JDM Group alleged that from January 2013 to August 2014, defendant Silk City sublet part of the premises, where it conducted a business of mixing and cutting cement and stone products. Plaintiffs assert that Silk City's business generated debris that infiltrated the premises and caused damage to their property, including the fabric rolls, which were allegedly conveyed to American Fabric by Coral Dyeing. Plaintiffs' complaint against Silk City alleged negligence, nuisance, and trespass. Plaintiffs also asserted a breach of contract claim against Verlan Fire, which issued a property damage policy to Coral Dyeing for the period between September 2013 and September 2014, that named plaintiffs as additional insureds.

Early in the litigation, plaintiffs moved to compel Silk City and Verlan to inspect the fabric rolls so as to preempt a spoliation defense. The motion was granted in January 2016 but the record reveals, without explanation, that the parties consented to the vacating of that order the following month. Then, in November 2016, plaintiffs moved for an order that would permit them to

"discard their damaged business personal property" that would preclude any party from "asserting a spoliation defense." This motion was denied.

In May 2017, Silk City moved for summary judgment; Verlan joined in. At the same time, Verlan moved for dismissal, claiming a spoliation of evidence; that is, that allegedly damaged fabric rolls were disposed of, or sold, and that others were added to the inventory, thereby precluding the opportunity to assess or understand the damages claimed. There was also a further impact on ascertaining which rolls were damaged as a result of Binson having disposed of Coral Dyeing's computers, which had been used to track the movement of fabric rolls, after the June 2014 transaction. The record was also rendered unclear as to American Fabric's right to seek damages by the fact that there was no clarity as to which fabric rolls were conveyed in the January 2014 transaction with Green Pond's predecessor and which came into Coral Dyeing's possession after January 2014 that it would ostensibly have been free to convey to American Fabric in June 2014.

The judge denied both motions in June 2017. In denying summary judgment, the judge identified a number of problems he saw with the case, including the impact of Green Pond v. American Fabric and the uncertainties about ownership of the allegedly damaged fabric rolls for which plaintiffs

20

sought relief in this case. In his written decision, the judge labeled plaintiffs' case "weak or problematic" but ultimately, because of the summary judgment standard, which obligated him to provide plaintiffs with all the legitimate inferences that might arise from the facts, Brill v. Guardian Life Ins. Co. of Am., 142 N.J. 520, 540 (1995), the judge allowed the case to proceed. As for the spoliation argument, the judge appears to have found spoliation but concluded that it did not immediately appear that dismissal was required; he instead left for later disposition – after a plenary hearing – whether or to what extent there should be a sanction for any spoliation of evidence.

The record on appeal reveals that the judge's efforts to move this case toward a trial became stymied by the applications by plaintiffs' then attorney to be relieved. The attorney's first motion was denied but a later motion, which was based on plaintiffs' alleged refusal to cooperate in the completion of discovery, was granted in November 2017. The judge also stayed the action for thirty days to allow for the retention of new counsel and a trial date was set to occur in mid-January 2018.

The spoliation hearing remained scheduled but did not take place because of plaintiffs' situation with its new counsel. That prompted the

21

following colloquy between the trial judge and Binson, who appeared pro se, in December 2017:

> THE COURT: I've been trying this – I'm trying to look at – I mean, I initially was setting a hearing on the spoliation back in August. And here we are, it's almost January, and we still don't have this reconsideration[6] decided because of your dragging your feet with your lawyer. And maybe what should have happened, maybe he shouldn't have been relieved if it was going to cause this kind of a problem.
>
> MR. BINSON: Well, that's the problem I have with the lawyer –
>
> THE COURT: Well, obviously you created a problem with your lawyer, or else he wouldn't have asked to get out of the case. Because I know, if I go forward – I know what I'm thinking right now, and I know if I go forward, whatever I do is just going to be reversed, because somebody is going to say I didn't give you the opportunity to be represented by counsel. This is becoming a farce. It's not fair to the other side. They have been prepared. They have been ready to go with this thing for months. For months.

Following that the judge turned his attention to the merits themselves, suggesting a change in tune regarding the defendants' prior application for summary judgment:

> THE COURT: The underlying matter, I denied summary judgment. Now, <u>I'm telling you that I'm thinking I may reverse that</u>. Based on everything that

---

6 Defendants had moved for reconsideration in the interim period.

I now have in the record which clearly shows there is not going to be anything forthcoming to show what fabrics or inventory actually came [to Coral Dyeing] after the [January 2014] sales agreement [and prior to the June 2014 transaction].

[Emphasis added.]

In recognizing the impropriety of considering defendants' pending motion without plaintiffs having counsel, the judge nevertheless expressed that he was "inclined – I can tell you right now my inclination is to grant the application" for reconsideration.

Plaintiffs' new attorney entered an appearance in late December, 2017, and requested an adjournment of the reconsideration motion that had been scheduled for early January 2018, as well as an adjournment of the trial because of his longstanding vacation plans. In January 2018, the judge denied the adjournment requests, granted the reconsideration motion, and, in reconsidering, granted summary judgment in favor of defendants.

In appealing, plaintiffs present the following arguments:

I. THE COURT BELOW ERRED IN GRANTING DEFENDANTS' MOTIONS FOR RECONSIDER-ATION WITHOUT A LEGAL OR FACTUAL BASIS ON JANUARY 2, 2018 AFTER DENYING THEM ON THE RECORD ON AUGUST 11, 2017.

23

A.  Neither Defendant Introduced New Or
Additional Information To The Court's
Attention.

B.  The Motions For Reconsideration Are
Merely An Attempt At Having A Second
Bite Of The Apple.

C.  The Trial Court's Rulings Granting
The Motions For Reconsideration Which
Reversed The Court's Prior Rulings
Denying Summary Judgment And
Reconsideration Were Not Based On
Credible Evidence In The Record.

II.  THE COURT ERRED IN REFUSING TO GRANT
PLAINTIFFS' COUNSEL'S APPLICATION FOR
ADJOURNMENT.

We reject Point II, finding it has insufficient merit to warrant further discussion in a written opinion.  R. 2:11-3(e)(1)(E).  We add only that trial courts have considerable discretion when ruling on adjournment applications, Kosmowski v. Atl. City Med. Ctr., 175 N.J. 568, 575 (2003), and we discern no abuse of discretion in the denial of an adjournment here, particularly when it was plaintiffs who had already delayed the proceedings by swapping attorneys, and particularly since plaintiffs have not shown how they were prejudiced.  See State v. Miller, 216 N.J. 40, 47 (2013); Smith v. Smith, 17 N.J. Super. 128, 133 (App. Div. 1951).

We also find no merit in plaintiffs' arguments that the judge erred or abused his discretion in reconsidering his earlier denial of summary judgment. Rule 4:42-2 authorizes a judge – in the exercise of sound discretion – to revisit an interlocutory order at any time prior to entry of final judgment when required by the interest of justice. See Lombardi v. Masso, 207 N.J. 517, 534 (2011). Without a doubt, the denial of summary judgment – the prior ruling that the judge reconsidered here – was interlocutory, see Gonzalez v. Ideal Tile Importing Co., 371 N.J. Super. 349, 356 (App. Div. 2004) (recognizing that "an order denying summary judgment . . . decides nothing and merely reserves issues for future disposition"), aff'd, 184 N.J. 415 (2005), and its reconsideration here was proper since final judgment had not yet been entered. Rule 4:42-2 does not, as plaintiffs' argument would suggest, require the submission of new or different material; a judge may revisit an interlocutory order when believing an earlier interlocutory ruling was mistaken.

We, thus, reject nearly the entirety of plaintiffs' arguments on appeal. In challenging the grant of reconsideration, plaintiffs have included only the most cursory suggestions about the existence of genuine factual issues that warranted a trial. That is, plaintiffs have expended nearly all their energies into arguing that the judge shouldn't have reconsidered the denial of summary

judgment, and have said very little about whether, if reconsideration was appropriate, the judge wrongly decided to reverse himself and grant summary judgment. Defendants – doubtless for sound tactical reasons – made little or no attempt to demonstrate that summary judgment was appropriately entered, choosing instead to simply respond to plaintiffs' meritless argument that the judge was not authorized or abused his discretion in reconsidering his prior ruling.

We are mindful – and plaintiffs' counsel should have been mindful too – that it was plaintiffs' "responsibility to refer us to specific parts of the record to support their argument" and that they could not "discharge that duty by inviting us to search through the record ourselves." Spinks v. Twp. of Clinton, 402 N.J. Super. 465, 474 (App. Div. 2008); see also State v. Hild, 148 N.J. Super. 294, 296 (App. Div. 1977). To seek our overturning of the disposition of which they were aggrieved, plaintiffs were obligated to show an error in the judge's grant of summary judgment. Instead, plaintiffs have almost entirely limited their argument to the question of reconsideration without, but a few generalities and quotations from the judge's earlier decision, explaining why the grant of summary judgment was erroneous. Because we find nothing wrong with the judge's willingness to reconsider his earlier ruling, the

inadequacies in plaintiffs' presentation on appeal leave us in the unhappy place of choosing between, on the one hand, affirming based on our view that reconsideration was not an abuse of discretion, or, on the other, scanning the record ourselves to determine whether summary judgment was properly granted. With some misgivings, we conclude that the administration of justice is better served in this instance by our independent review of the parties' factual assertions on summary judgment despite the shortcomings in plaintiffs' submissions in this court.

As defendant Silk City correctly recognizes, the summary judgment that concluded this matter was "at its core" based on two concepts: that a plaintiff "cannot sue for damages on goods it does not own" and "cannot go to trial without competent evidentiary damage proofs." These assertions, of course, are true, but it is far from clear whether it can be said – on this record – that plaintiffs cannot claim ownership of the allegedly damaged fabric rolls or that their proofs are insufficient as a matter of law.

As to the former proposition, the judge was required to deal with the judge's finding in <u>Dombrow v. Binson</u> that American Fabric was the owner of the fabric rolls located at the premises. To be sure, the documentation concerning the transaction between Coral Dyeing and Green Pond's

predecessor – particularly the UCC financing statement – might suggest that these fabric rolls were conveyed to Green Pond's predecessor in January 2014. But the Dombrow v. Binson judge determined that the fabric rolls in the premises belonged to plaintiffs and the judge in Green Pond v. American Fabric found only that the equipment and machinery belonged to Green Pond without determining whether Green Pond was also the rightful owner of any fabric rolls still in the premises. If there is some finer point to put on the dispute about ownership as it arises in this case, or if there is some reason – as the judge here held – that the findings in the other cases are not binding on these defendants, we leave those matters for another day. As a matter of summary judgment, there is – at best – a dispute about whether plaintiffs own the fabric rolls for which they seek damages here.

Moreover, even if fabric rolls were conveyed to Green Pond's predecessor by way of the January 2014 transaction, and even if the finding in Dombrow v. Binson about ownership should not be binding on Silk City or Verlan – they not being parties to the other cases – it seems clear that any rolls added to inventory after the January 2014 transaction would not be encompassed by that transaction but would have, instead, been transferred to plaintiffs here in June 2014. Although the judge determined that plaintiffs

"cannot prove what inventory was added after" the January 2014 transaction, there is no clear explanation as to why it was fair for him to draw such a conclusion. In fact, in responding to summary judgment, plaintiffs asserted that after the January 2014 transaction, "Coral carried its own inventory separate from [Green Pond's predecessor's] inventory . . . and that [Green Pond's predecessor's] portion of the inventory was removed from the subject property . . . in June 2014." If there is truth to this assertion – and we assume its truth for purposes of summary judgment – then it could be presently inferred that the allegedly damaged fabric rolls at the premises in or after June 2014 are the rightful property of plaintiffs.

Contrary to the judge's statement in his two-page written decision in June 2017, when summary judgment was denied, about the apparent difficulties plaintiffs would face in attempting to prove ownership and damage, the judge asserted in his three-page January 2018 written opinion that, "[u]pon further reflection," those same problems now appear to be insurmountable and, if attempted, "would invite the jury to speculate." He provided little explanation for this conclusion. In reversing summary judgment and in remanding the matter for further proceedings, we agree that plaintiffs will be put to the difficult task of proving that any damaged fabric rolls belong to

29

them and not to Green Pond, that they were damaged after being conveyed in June 2014 (because there appears no genuine doubt that the rolls were conveyed "as is" and it is conceivable that some or maybe all the damage allegedly caused by Silk City occurred prior to June 2014), and the quantum of any such damage. In opposing summary judgment on the earlier occasion, plaintiffs provided expert analysis of the alleged property and its alleged damage. Plaintiffs were not obligated – in opposing summary judgment – to actually prove their case, only whether there is a genuine factual basis for their claims. At the summary judgment stage, a court must not be concerned with the evidence's weight or whether those who have yet to testify are credible.[7]

We recognize that plaintiffs may have a difficult time demonstrating the elements of their claims against Silk City and Verlan, but we do not see why they should be deprived of that opportunity. If, as the motion judge believed, the jury would be left to speculate on what it is that plaintiffs must prove after hearing plaintiffs' expert's testimony and after hearing Binson or any other individual with personal knowledge attempt to provide a factual basis for the

---

[7] In originally denying summary judgment in June 2017, the judge stated in his written opinion that he "f[ou]nd[] the credibility of Jacob Binson to be questionable." He did not explain nor is it clear to us why the judge made such an observation or how the judge was able to assess Binson's credibility by way of the summary judgment submissions.

expert's views, then if and when defendants move for an involuntary dismissal, the judge will be in a far better position to opine on the evidence's sufficiency than anyone can say at the present time. But we cannot agree it has been demonstrated that the difficulties plaintiffs will face, in seeking to prove their case, are so onerous that, as a matter of summary judgment, their claims must be short-circuited prior to trial.

So, in short, we reverse the summary judgment entered in favor of defendants and remand for further proceedings.

IV.

To summarize our disposition of these appeals, in Dombrow v. Binson (A-4616-17), we affirm the judgment and orders under review. In American Fabric v. Silk City (A-2855-17), we affirm the orders under review insofar as they denied plaintiffs' request for an adjournment and insofar as they granted reconsideration, but we reverse insofar as the court, in reconsidering, granted summary judgment in favor of defendants, and we, therefore, remand for further proceedings.[8] We do not retain jurisdiction.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

---

[8] No one has argued that the trial judge erred in scheduling a hearing to consider further the spoliation issues. Because the judge ultimately granted summary judgment, he concluded there was no need to conduct the spoliation hearing. No one appealed that disposition. Now that we have reversed summary judgment, the door is opened again to those spoliation issues.